## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-20043-01-JAR |
| | ) | |
| DOMINGO URIARTE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS

This case is before the Court on Defendant Domingo Uriarte's Motion to Suppress

Evidence (Doc. 35). The Court held a suppression hearing on December 23, 2015. Having

considered the briefs and the evidence submitted at the hearing, the Court is prepared to rule on

Defendant's motion. For the reasons stated below, the Court denies Defendant's motion to

suppress evidence.

### I.       Facts

The Court finds the following facts by a preponderance of the evidence. On April 23,

2015, Task Force Officers Eric Jones and Shawn Buck were informed by a confidential source

("CS"), with whom they and other officers had been working for many months, that a large

shipment of drugs was on its way to Kansas City to be picked up by Oscar Aguilera. The Drug

Enforcement Agency ("DEA") had been investigating Aguilera since 2013 in connection with

the operation of a drug trafficking organization in the Kansas City area. Prior information

collected by the DEA had indicated a large shipment of either marijuana or methamphetamine

would be sent to Kansas City; the CS believed the shipment would contain marijuana. Aguilera

had contacted the CS because he needed a truck and a place to unload the drugs when the

shipment arrived.  On the afternoon of April 23, 2015, Aguilera, the CS, and a third man arrived at a Penske rental facility in Missouri to rent a truck.  With information provided by the CS, the agents conducted surveillance on the Penske facility while the three men were there.  The CS rented a truck using his credit card.  Aguilera drove the truck to a sheet metal company in Kansas City, Kansas, with the CS following in Aguilera's Jeep.  Aguilera backed the truck to a loading dock, and rode with the CS to an auto repair shop at 956 Scott Avenue, in Kansas City, Kansas. The auto repair shop was a known meeting place for Aguilera's drug trafficking organization. The CS informed the officers by text message that they were waiting for someone to arrive who would be responsible for the drug shipment.

That evening, a white Toyota Yaris arrived at the auto repair shop on Scott Avenue, with two men inside.  They picked up Aguilera and drove away.  Later, the Yaris returned to the auto shop and dropped off Aguilera before driving away again.  The Yaris was a rental car, rented by Domingo Uriarte, Jr.  Agents were able to obtain a driver's license photo of Uriarte.  The CS informed the officers that Uriarte was the "driver," the person responsible for picking up the drug shipment.

The CS and Aguilera drove back to the sheet metal company and picked up the truck; Aguilera drove the truck to 956 Scott Avenue and parked it across the street from the auto repair shop.  The CS informed the officers that the shipment would not be coming until the following day.  The agents conducted surveillance on the truck all night, and during the night placed a GPS tracking device on the truck.  The following day, the CS informed the agents that the shipment was delayed and would not arrive until the following Monday.  He returned the Penske truck. The agents discontinued surveillance during the weekend.

On the morning of Monday, April 27, 2015, the CS contacted TFO Buck and informed him that Aguilera had arrived at his home and told him they needed to rent another truck because the shipment was going to arrive.  Aguilera and the CS drove to a City Rent-A-Truck facility in Kansas City, Missouri, where the CS again rented a truck using his credit card.  Aguilera left the facility while the CS was completing the rental paperwork.  The CS drove the truck about two blocks from the rental facility and met TFO Jones; the CS gave TFO Jones permission to place a GPS tracking device on the truck.  The CS then drove the truck to 956 Scott Avenue.  Defendant Uriarte picked up the truck and drove it to a business complex in Kansas City, Missouri.  The agents followed him, but lost sight of him when he drove around the corner to the loading docks. He eventually left the complex and drove to Home Depot, where he parked the truck and walked away.  Later, Defendant, the CS, and Defendant's nephew returned to the truck, looked in the back, and then left again.  Agents could see into the back of the truck and knew it was empty. The CS met with TFO Buck after Defendant and his nephew had gone to a hotel, and informed him that Defendant would not be able to pick up the load until the following day because of a problem with his payment.  The CS informed the agents that the drugs would be in a large piece of machinery that was being shipped from California.

At 6:45 a.m. on Tuesday, April 28, 2015, TFO Jones received notice from the GPS that the truck was moving.  He followed the truck and told other officers to go to the business complex in Kansas City, Missouri where Defendant Uriarte had driven the truck the day before. TFO Jones and another agent arrived at the business complex shortly after the truck, around 7:15 a.m.  They could see that the truck was backed up to a loading dock.  The other agent got closer on foot and was able to see movement in the truck, as though it was being loaded.  The truck left the complex, and TFO Jones could tell that only Defendant Uriarte was inside.  Jones followed

3

the truck and contacted Kansas Highway Patrol ("KHP") officers Jimmerson and Nicholas, with whom he had been in contact before, to request that they follow the truck and find an independent reason to conduct a traffic stop of the truck.  TFO Jones testified that he already had probable cause, but he wanted the KHP to develop independent probable cause to stop the truck so as to avoid compromising the DEA's ongoing investigation.  TFO Jones arranged for space to be available at the Wyandotte County garage to bring the truck and open the machinery after the traffic stop.

Trooper Nicholas of the KHP waited for the truck near the highway, and began following it as Defendant Uriarte exited I-70 onto 7th Street in Kansas City, Kansas.  The trooper's vehicle was equipped with a video camera, and the video recording of the traffic stop of Defendant Uriarte was admitted into evidence as Government's Exhibit 15.  As can be seen in the video, Trooper Nicholas observed Defendant Uriarte commit two traffic violations while he was following the truck.  First, although the trooper was still fairly far behind the truck, it can be seen that as Defendant reached the intersection of 7th Street and Kansas Avenue, he pulled too far into the crosswalk, past the stop line, before turning right at the red light.  After Defendant turned onto Kansas Avenue, Trooper Nicholas continued to follow him and activated the lights on his vehicle.  Defendant continued driving for about half a block, then turned right onto 10th Street at a red light, again without stopping first.  Defendant finally pulled the truck over after turning onto 10th Street, and was positioned across the street from 956 Scott Avenue.

Trooper Nicholas is also a Level II certified commercial vehicle safety inspector.  With his certification, Trooper Nicholas is permitted to stop commercial vehicles and do a "walkaround" inspection, even if they have not committed a traffic violation.  The trooper testified that a walkaround inspection includes checking the truck's logbook, registration,

insurance, bill of lading, truck components, safety equipment, and tires, among other things.  He

is also able to look inside the cab and freight compartment of a truck as part of a walkaround

inspection.

After Defendant Uriarte initially stopped the truck, Trooper Nicholas requested that he

drive around the corner so he could conduct a commercial vehicle safety inspection.  Trooper

Nicholas noted that Defendant acted very nervous, more than he considered normal, and that

there were some unusual issues with the paperwork. For example, the same name was on the

"from" and "to" lines of the documents, and Defendant stated that he was driving the truck for

his cousin but did not have a company name or business address or department of transportation

number.  After completing the inspection and checking Defendant's driver's license, the trooper

returned Defendant's paperwork and checked the secureness of the load inside the back of the

truck.  Then, he told Defendant to have a good day, and began walking away.  He quickly turned

back and asked Defendant if he could ask him some more questions.  Defendant gave verbal

permission.  The trooper then asked Defendant if he could search the truck, to which Defendant

also granted permission.  Another officer pulled up to assist, and Trooper Nicholas visually

inspected the wooden crate in the cargo area of the truck.  He then told Defendant he wanted to

open the crate, and that they would need to move to another location.  Trooper Nicholas asked

Defendant for his cell phones, which Defendant handed over voluntarily.  Trooper Nicholas then

instructed Defendant to drive to the Wyandotte Country garage; the other trooper drove his

police vehicle in front of the truck, and Trooper Nicholas followed the truck in his own vehicle.

At the garage, the troopers and the other agents involved in the investigation removed the

wooden crate from the back of the truck, opened it, and found a large metal lathe inside.  The

officers removed a panel from the lathe and found multiple bundles inside, wrapped in tape.  One

of the agents slit open a bundle and found that it contained methamphetamine.  At some point while at the garage, the officers had handcuffed Defendant; after the bundles were found, he slipped a hand out of the cuffs and ran into a wooden ravine.  TFO Jones chased Defendant and apprehended him.

## II.      Discussion

Defendant seeks to suppress the methamphetamine recovered from the truck on three bases.  He argues that the agent's placement of the GPS tracking device on the rental truck, without a warrant, was unlawful, and that the subsequent traffic stop and search of the truck should be suppressed as the fruit of the poisonous tree.  He further argues that the traffic stop itself was unlawful because it was not justified by reasonable suspicion at its inception, and it was prolonged beyond the appropriate amount of time for such a stop.  Defendant also argues that his consent to search the truck was not voluntary.

### A.  Placement of the GPS tracking device on the rental truck

Defendant argues that TFO Jones' placement of the GPS device on the rental truck without a warrant was a violation of Defendant's rights and contrary to the Supreme Court's precedent in *United States v. Jones*.[1]  The Supreme Court decided in *Jones* that placement and use of a GPS device to monitor a vehicle's movements is a search within the meaning of the Fourth Amendment.[2]  Defendant emphasizes here that TFO Jones only knew the rental truck was leaving the Home Depot parking lot because of the GPS notice; the CS did not know Uriarte had gone to pick up the shipment, so it was only through the use of the GPS device that the agents were able to observe the truck pick up the drugs.

---

[1] – U.S. –, 132 S. Ct.  945 (2012).

[2] *Id.* at 950.

Despite Defendant's arguments, the placement of the GPS is not grounds to suppress the evidence because TFO Jones received permission from the CS, who was also the renter and authorized driver of the truck, to place the GPS on the truck. "[V]oluntary consent by a third party with actual or apparent authority is a well-established exception to the warrant requirement."[3] The CS's consent to the GPS placement obviated the need for a warrant, and the Supreme Court's analysis and holding in *Jones* is therefore not relevant to the present case. The Court determines that the placement of the GPS device on the truck was lawful and denies Defendant's motion to suppress evidence on that basis.

### B.  Traffic stop of the truck by Trooper Nicholas

Defendant contends that the traffic stop conducted by Trooper Nicholas was unlawful because it was not supported by reasonable suspicion, and because it was prolonged beyond a reasonable amount of time. "A traffic stop is a seizure within the meaning of the Fourth Amendment 'even though the purpose of the stop is limited and the resulting detention quite brief.'"[4] "An ordinary traffic stop, however, is more analogous to an investigative detention than a custodial arrest."[5] "To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'"[6] The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has

---

[3] *United States v. Wilfong*, 528 F. App'x 814, 817 (10th Cir. 2013) (quoting *United States v. Benoit*, 713 F.3d 1, 8 (10th Cir. 2013)).

[4] *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

[5] *Id.* (citation omitted).

[6] *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[7]

It is clear in the video recording from Trooper Nicholas' vehicle that he observed Defendant commit two traffic violations while he was following the truck. Even if they were relatively minor traffic violations, they provided the trooper with a reasonable basis to stop the truck and initiate an investigative detention of Defendant.

Trooper Nicholas had an additional reasonable basis to initiate an investigative detention of Defendant due to his authority to inspect commercial vehicles. In Kansas, "[c]ommercial motor carriers are highly regulated . . . . K.S.A. 74-2108(b) grants authority to the highway patrol to stop and examine such vehicles to insure compliance with state laws."[8] K.S.A. 66-1324 deals with vehicle inspections, providing that

> [n]othing in this section shall be construed as prohibiting . . . any member of the state highway patrol from stopping any or all motor carriers, trucks or truck tractors for the purpose of conducting spot checks to insure compliance with any state law relating to the regulation of motor carriers, trucks or truck tractors.[9]

The highway patrol thus has the authority, recognized by the Kansas Supreme Court,[10] to randomly stop and inspect commercial vehicles in Kansas, without a warrant or observation of a traffic violation.[11]

_____

[7] *Id.* at 787.

[8] *Kansas v. Bone*, 6 P.3d 914, 916 (Kan. Ct. App. 2000).

[9] K.S.A. 66-1324; *see also Bone*, 6 P.3d at 916.

[10] *Kansas v. Crum*, 19 P.3d 172, 175 (Kan. 2001) (quoting *Kansas v. Williams*, 648 P.2d 1156, Syl. (Kan. 1982)) ("A warrantless inspection of a motor vehicle authorized to transport property for hire and subject to regulations of the State of Kansas, which was stopped by an officer of the Kansas Highway patrol solely to conduct an inspection pursuant to K.S.A. 74-2108(b) without any suspicion on the part of the officer that there was a violation of any laws of the State of Kansas, does not violate . . . the Fourth Amendment to the United States Constitution . . . .").

The fact that Trooper Nicholas observed Defendant commit two traffic violations, in addition to the fact that the trooper had the authority to inspect commercial vehicles without a warrant or any observed violation, leads the Court to conclude that the stop was valid and did not violate Defendant's Fourth Amendment rights.  Furthermore, even if the trooper had not had a reasonable basis to stop Defendant because of the traffic violations or under his authority to inspect commercial vehicles, the vertical collective knowledge doctrine would impute to Trooper Nicholas the DEA's (specifically, TFO Jones' and TFO Buck's) probable cause to detain Defendant.  That doctrine contemplates a scenario in which "one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action."[12]  The Tenth Circuit has held, in situations similar to this one, that a patrolman who stopped and searched a vehicle based on a request from a DEA agent could act "on the strength of the DEA's probable cause . . . .  He merely supplied a cover story . . . that would mask the basis for his alternative probable cause (the drug trafficking)."[13] The court recognized that as a common and acceptable tactic used to protect ongoing investigations and the identities of confidential sources.[14]

---

[11] There was some discussion during Defendant's cross examination of Trooper Nicholas about whether the truck could have been considered a commercial vehicle if the trooper knew that it was actually carrying drugs rather than commercial goods.  Kansas defines a commercial motor vehicle, in relevant part, as "[a] vehicle that has a gross vehicle weight rating or gross combination weight rating, or a gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater."  K.A.R. 82-4-1(f)(1) (2013).  There is no dispute that the truck Defendant was driving met the weight requirements to be considered a commercial vehicle.  K.S.A. 66-1324 allows highway patrol officers to stop and inspect any trucks or truck trailers, in addition to motor carriers.  Even if the trooper suspected that the truck was not carrying commercial goods, he still had the authority under that statute to inspect a truck that met the weight requirement for a commercial vehicle.  Furthermore, it would be nonsensical to interpret Kansas law as allowing the inspection of any trucks, *except* those suspected of carrying contraband.

[12] *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

[13] *Id.* at 1347.

[14] *Id.*

It is clear in this case that the DEA had probable cause to stop Defendant for drug trafficking.  The agents had been in communication with the trooper and informed him of the basis for their probable cause and some details about the investigation.  TFO Jones and Trooper Nicholas both testified that the trooper was to develop his own independent basis for pulling the truck over in order to protect the ongoing investigation.  Even if the trooper had not developed his own basis for pulling Defendant over, though, the stop still would have been valid based on the vertical collective knowledge doctrine.

The Court further concludes, for a number of reasons, that the duration of the stop did not cause it to become unlawful.  First, and most importantly, because the DEA's probable cause is imputed to Trooper Nicholas, he had probable cause to search the truck.  The duration of the stop was not excessive or unlawful in light of the trooper's probable cause.  Second, Trooper Nicholas testified that commercial vehicle inspections generally take longer than a normal traffic stop would.  Because the trooper had the authority to inspect the truck under Kansas law, the Court finds that he could detain the truck and Defendant for as long as that inspection reasonably lasted.  After he completed the inspection, the trooper ended the encounter and then reinitiated it, asking Defendant if he could ask him additional questions, to which Defendant agreed.

As explained more fully below, the Court finds that the second part of the encounter, after the trooper reinitiated contact with Defendant, was consensual.  The duration of the first part of the encounter is therefore justified by the fact that it involved a commercial vehicle inspection, and the second part of the encounter was based on Defendant's consent.  Finally, the trooper also noticed certain unusual things as he inspected the truck, such as the fact that the freight was being delivered to the same person from whom it was sent, and the fact that some of the documents Defendant provided appeared unprofessional and inauthentic.  Even if the trooper

10

had not already possessed probable cause to prolong the encounter and search the truck, those unusual findings would have given rise to reasonable suspicion, allowing the trooper to prolong the encounter beyond the length of a normal traffic stop.

### C.  Voluntariness of Defendant's consent to search the truck

Defendant argues that his consent for the trooper to search the truck was involuntary because it was given in such close temporal proximity to an illegal detention.  He contends that in order for the consent to be voluntary, more time was required between the end of the allegedly illegal detention and the beginning of the consensual encounter, or an intervening circumstance.

Defendant's argument fails for two reasons.  First, because Trooper Nicholas had probable cause to search the truck, imputed to him from the DEA, he did not need Defendant's consent to search.  He asked Defendant for consent because he was attempting to protect the DEA's investigation into the drug trafficking organization, but he could search without Defendant's consent.  The question of whether Defendant's consent was voluntary therefore does not affect the outcome of the suppression motion.

Second, the Court has determined that the initial detention was lawful even without considering the DEA's probable cause, because Trooper Nicholas observed Defendant commit two traffic violations, and the trooper had authority to conduct truck inspections even without a violation.  After completing the inspection, the trooper returned Defendant's documents, told him to have a nice day, and began to walk away.  Although he reinitiated contact shortly afterward, the initial detention was over, and a reasonable person would have understood that he was free to leave.  Indeed, the Tenth Circuit has recognized that "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of

authority."[15]  The video demonstrates that there was nothing coercive in Trooper Nicholas's manner when he asked Defendant if he could ask him more questions, nor was there a show of force or coercion when he asked to search the truck.  Defendant never attempted to withdraw or modify his consent, and made no indication that he wanted to leave or end the encounter.  The Court finds that Defendant's consent to the search was voluntary, and that the trooper had probable cause to search even without Defendant's consent.[16]

### III.    Conclusion

Based on the factual record and evidence presented at the suppression hearing, the Court finds that the DEA's placement of the GPS device on the rental truck did not violate Defendant's Fourth Amendment rights because the confidential source, who was listed as the authorized driver on the rental agreement, gave TFO Jones permission to place the device on the truck.  The Court also finds that the traffic stop was lawful, because Trooper Nicholas observed Defendant commit two traffic violations, he had authority to conduct commercial vehicle inspections even without observing a violation, and the DEA's probable cause to search the truck is imputed to the trooper under the vertical collective knowledge doctrine.  Finally, the Court concludes that Defendant's consent for the trooper to search the truck was voluntary, and in any event the trooper did not need Defendant's consent to conduct the search because he had probable cause.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 35) is denied.

**IT IS SO ORDERED.**

---

[15] *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005).

[16] Defendant's motion briefly touches on statements Defendant made to the officers, and suggests that they should be suppressed as the fruit of the poisonous tree.  No evidence was presented at the hearing about statements by Defendant.  Additionally, the Court finds that none of the trooper's actions in stopping the truck or conducting the search violated Defendant's constitutional rights; accordingly, this aspect of Defendant's motion is moot.

Dated: <u>January 11, 2016</u>

<u> S/ Julie A. Robinson</u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE